STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. LEONARD EDWARDS, DEFENDANT-APPELLANT.

Argued October 21, 1958—Decided November 17, 1958.

*Mr. Charles J. Tyne* argued the cause for appellant.

*Mr. William J. Arnold* argued the cause for the State (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney; *Mr. William C. Brudnick,* Special Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

WACHENFELD, J.   The defendant waived trial by jury and was convicted by a judge of the Bergen County Court of the crime of atrocious assault and battery. *N. J. S.* 2A:90-1. An appeal was taken and, at this juncture, we granted certification to the Appellate Division on our own motion.

The only ground urged for reversal is that the injuries sustained by the victim were not sufficiently severe to warrant a conviction of *atrocious* assault and battery.

The defendant admits striking the victim in the face with his fist and pushing her into some bushes, but claims his actions amounted to only simple assault and battery. Formerly a crime, simple assault and battery has now been downgraded to a disorderly persons offense which is triable only in the municipal court. *State v. Maier,* 13 *N. J.* 235 (1953). Thus, if the defendant's contention is correct, the Bergen County Court had no jurisdiction over his offense.

On September 1, 1957 the defendant and one Mary Harbochuk had been making the rounds of various taverns in Passaic, Carlstadt and East Rutherford. She claimed the altercation ensued when the defendant tried to kiss her on the public street and she resisted his advances. He contended he had attacked Mary because she refused to return $40 he had entrusted to her. In any event, the girl was found by the police "moaning in a pitiful manner" and in

a "semi-nude" condition. She was "hysterical," with her dress up and wearing nothing from the upper abdomen down, and her pants and shoes were found in the general area. She could not say whether sexual intercourse had been attempted since, as a result of the struggle, she became "semi-conscious." She was lying in the bushes on a vacant lot, about ten feet from the sidewalk. The injuries sustained as a result of the battery were multiple scratches and bruises.

Mary testified: "I had a bruised lip and I had black and blue marks under my chin, on my chin, under my eye, on my forehead, my neck and inside my thighs and scratches all over." She testified the scratches had been bleeding. Two photographs showing her physical condition were offered in evidence. The marks on her neck were apparent for "two or three weeks" later; they "gradually went away."

Police Officer Meyers testified she was "quite bruised and her left eye was bruised and her neck had a few scratches on. Her lip was bruised, had a bruise." He also stated one of her eyes was discolored.

Police Lieutenant Shevak saw the victim after she had been discharged from the hospital: "* * * she had a badly swollen eye, a lot of scratches around her neck, a split lip and bad bruises on the back of her left ear."

Dr. Coenca, an interne at the Hackensack Hospital who had treated the victim in the emergency room, stated: "She had scratches on her face and neck and scratches on her legs and thighs and some bruises too. * * * I think she had some very superficial lacerations around the eyes on one side and the cheek, I think—but very superficial— merely scratches more than lacerations." Her left eye had "a very small laceration but it was not deep enough to be sutured." The victim remained at the hospital two or three hours.

When asked by the court, "Could you characterize the injuries as showing a savage or brutal beating?", the doctor replied: "It might be, but—I cannot be sure."

As to the attack itself, Mary testified: "He grabbed me by the throat. He dragged me a little ways into a lot and

I started screaming. * * * I was struggling with him. So he brought me back further into the lot and he got me on the ground and he had his knee in my stomach and was choking me and I was trying to fight him off. I kept getting near unconsciousness. * * * I thought he was going to kill me right there and I got on top of him once and started choking him but I couldn't hold him. * * * The next thing I remember was the emergency crew came and I saw lights and a stretcher."

The defendant's version of the attack appears in his voluntary statement, in which he said: "I struck her with my fist in her face, then I pushed her into the bushes near the sidewalk, then she fell down and I took my money and I left."

The inquiry thus arises whether the attack and the results of it were sufficient to bring the crime within *N. J. S.* 2*A* :90–1, under which the defendant was indicted. The statute reads as follows:

"Any person who commits an atrocious assault and battery by maiming or wounding another is guilty of a high misdemeanor."

The trial judge, in the course of his oral opinion, said:

"The law says that where a maiming or wounding is done by assault and battery that is savagely brutal or outrageously, or inhumanly cruel or violent, it amounts to atrocious assault and battery within the meaning of the statute."

He defined "wounding" as meaning "injuring or hurting of a body such as bruising, contusing, lacerating, fracturing, dislocating, puncturing or cutting." He concluded:

"In my opinion this was an outrageous, wanton, wilful attack upon this girl. She was dragged into a field, beaten with fists, scratched."

The question presented by this appeal was only tangentially considered in the very recent case of *State v. Riley,* 28 *N. J.* 188 (1958). There, the decision turned upon whether a "wounding," as the word is used in *N. J. S.*

2A:90–1, necessarily required a breaking of the victim's skin. Here, the question facing us is whether or not the injuries inflicted were sufficiently serious so that when considered in conjunction with the manner of the assault the defendant's offense can properly be classified as atrocious assault and battery, within the meaning of the statute upon which the indictment was based.

In the *Riley* case we pointed out that atrocious assault and battery was defined in *State v. Capawanna,* 118 *N. J. L.* 429, 432 (*Sup. Ct.* 1937), affirmed *p. c.* 119 *N. J. L.* 337 (*E. & A.* 1938), as "an assault and battery that is savagely brutal or outrageously or inhumanly cruel or violent," and that similarly in *State v. Maier, supra,* this court distinguished atrocious assault and battery from other types of aggravated assault and battery on the ground that *N. J. S.* 2A:90–1 penalized the "vicious act" of the defendant rather than his evil purpose, *N. J. S.* 2A:90–2, or his use of offensive weapons or threats of violence, *N. J. S.* 2A:90–3.

Again, in *State v. McGrath,* 17 *N. J.* 41, 49 (1954), in discussing the difference between simple assault and battery and atrocious assault and battery, this court stressed the nature, or brutal quality, of the defendant's act as an important element.

██ These cases make it quite clear that to constitute an atrocious assault and battery the assault must be savagely brutal or outrageously or inhumanly cruel or violent and that the nature of the attack is of paramount importance in determining whether the crime has been committed. The kind and severity of the injuries inflicted is another factor to be taken into consideration.

Although we decided in the *Riley* case, *supra,* that it would be impractical to endeavor to spell out a precise rule which would, *in futuro,* automatically decipher the difference on all occasions between simple assault and battery and atrocious assault and battery no matter what the facts might be, we definitely concluded that we would not accept the highly arbitrary rule that a "wounding" must necessarily entail a breaking of the skin.

The defendant, by his waiver of a jury trial, voluntarily entrusted the determination of the evidential facts and their legitimately derivative inferences to the trial judge, and the record before us discloses ample evidence justifying the judge's conclusion that this was an "outrageous, wanton, wilful attack upon this girl."

The victim was "grabbed" by the throat and "dragged" into the lot. She was thrown to the ground. Her assailant had his knee in her stomach and was choking her. She was on the verge of "unconsciousness." She "thought he was going to kill [her] right there." The next thing she remembered was "the emergency crew came and I saw lights and a stretcher." It seemed to her that she had struggled for an "awful long time."

The defendant's attack was savagely brutal within the meaning of the statute in question, but, having thus decided, the inquiry still remains as to whether or not the injuries inflicted were sufficiently severe or substantial to satisfy the statutory definition of atrocious assault and battery.

Although, generally speaking, penal statutes are to be strictly construed, *State v. Meinken,* 10 *N. J.* 348 (1952), the rule of strict construction does not mean that the manifestations of the Legislature's intention should be disregarded. *State v. Friedman,* 135 *N. J. L.* 419 (*Sup. Ct.* 1947), affirmed *p. c.* 136 *N. J. L.* 634 (*E. & A.* 1948). Thus, the word "wounding," under these circumstances, should not be given a strained or technical meaning but should be interpreted according to its plain, obvious import, as the word is commonly employed.

In *Gatlin v. State,* 18 *Ga. App.* 9, 89 *S. E.* 345 (*Ga. App. Ct.* 1916), the court construed "wound" to include "injuries of every kind which affect the body, whether they are cuts, lacerations, fractures, or bruises," while *Bouvier's Law Dictionary* (*Baldwin's Cent. Ed.* 1940), defines the word as:

"WOUND. Any lesion of the body.

In this it differs from the meaning of the word when used in surgery. The latter only refers to a solution of continuity; while

the former comprises not only these, but also every other kind of accident, such as bruises, contusions, fractures, dislocations, and the like."

■ To warrant a conviction of atrocious assault and battery, the injuries inflicted need not be permanent but they must nevertheless be substantial rather than superficial and should be considered in conjunction with the character of the assault made.

The defendant complains that "[t]he court did not follow and apply the rules of construction applicable to this highly penal statute and did not make a finding of fact in accordance with the evidence and the law applicable thereto."

■ We find to the contrary. In summary, the injuries inflicted upon the victim consisted of a badly swollen eye, a laceration beneath the eye, bad bruises on the back of her left ear, black and blue marks under and on her chin, on her forehead, neck and inside her thighs, and scratches all over which bled. She was given hospital treatment, although released after two hours, and the marks of her injuries were apparent for two or three weeks.

True, the doctor testified that the scratches were superficial, but whether, in legal contemplation, they were or not was a question for the court to decide, taking into account the evidence of all of the other witnesses who seemed to think otherwise.

Under these circumstances, it became a question of fact to be decided by the trial judge, sitting without a jury, as to whether or not the injuries sustained were sufficiently substantial to come within the definition of the statute. He found against the defendant in this respect, and we are in accord.

The judgment below is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—Justice HEHER—1.

Heher, J. (dissenting). The grand jury deemed the evidence insufficient to warrant an indictment of the defendant for assault with intent to commit rape, a high misdemeanor under *N. J. S.* 2A:90–2. We were so advised by the assistant county prosecutor on the oral argument of this appeal. There is no contention here that such was the nature of the assault; and the evidence adduced would reasonably sustain the inference of a physical altercation devoid of an intent to ravish, an encounter born of excessive indulgence in an assortment of alcoholic drinks, both by the prosecuting witness and the defendant, during a round of public bars.

There is no occasion to recount the evidence adduced as proof of the charge laid to the defendant. The indictment alleges an atrocious assault and battery, also a high misdemeanor under *N. J. S.* 2A:90–1. But there the act denounced is "atrocious assault and battery" by "maiming or wounding" another. We are not concerned here with intent or motive such as characterizes an assault with intent to commit rape. The physical injury suffered must plainly come within the definitive term "maiming or wounding," the very essence of the high misdemeanor classified as atrocious assault and battery; sordid performance is not enough. Here, "maiming or wounding" constitutes "atrocious assault and battery," quite unlike the principle of the companion provisions, *N. J. S.* 2A:90–2, 2A:90–3, where the offenses involve an intent to commit one of the enumerated felonies or the use of an "offensive weapon or instrument," described in the caption as an "assault with dangerous weapon." The terms "maiming or wounding" take color from each other under the interpretive principle, *noscitur a sociis,* that words of analogous meaning in a statute are to be taken in their cognate sense of the same nature or quality. And the limitation has especial significance in the interpretation of a statute defining punitive offenses, expressed in the rule that penal statutes are to be strictly construed.

"Maim" in its common acceptation means (a) to "deprive of the use of a limb or member, so as to render a person

in fighting less able either to defend himself or to annoy his adversary"; to "commit mayhem upon"; (b) to "mutilate or seriously wound or disfigure; disable." And "wound" means to "produce a breach, or separation of parts, in, as by a cut, stab, blow, or the like; as, to wound an enemy with a sword; to wound a tree with an ax." *Webster's New International Dictionary* (*2d ed.*).

"Mayhem" is defined by statute, *N. J. S. 2A*:125–1, to include any person who, "from premeditated design, evinced by lying in wait for the purpose, or in any other manner, or with intent to kill, maim or disfigure, cuts out and disables the tongue, puts out an eye, cuts off or slits a lip, cuts off, slits or destroys a nose or ear, or cuts off or disables any limb or member of another, willfully and on purpose, * * *," an offense made a high misdemeanor.

An assault with intent to kill, commit burglary, kidnapping, rape, robbery, sodomy or carnal abuse is classified as a high misdemeanor, *N. J. S. 2A*:90–2; and so also, *N. J. S. 2A*:90–3, a willful or malicious assault of another "with an offensive weapon or instrument," or a demand of money or personal goods and chattels of another "by menaces, force or violence, * * * with intent to rob such other person." High misdemeanors are punishable, *N. J. S. 2A*:85–6, by a fine of not more than $2,000, or by imprisonment for not more than seven years, or both, absent specific provision otherwise, and such is the case with *N. J. S. 2A*:90–2, providing for a fine of not more than $3,000, or by imprisonment for not more than twelve years, or both.

"Assaults, batteries" and certain other enumerated offenses, and all other offenses of an indictable nature at common law, "and not otherwise expressly provided for by statute," are denominated misdemeanors, punishable by a fine of not more than $1,000, or by imprisonment for not more than three years, or both, unless otherwise specifically provided. *N. J. S. 2A*:85–1, formerly *R. S. 2*:103–1; *N. J. S. 2A*:85–7.

And now, all such assaults and batteries of lesser gravity and degree, formerly termed misdemeanors, are classified as disorderly conduct. One who commits "an assault or

assault and battery" is a disorderly person, *N. J. S.* 2A:170–26, punishable by imprisonment for not more than one year in a county workhouse, penitentiary or jail or a fine not to exceed $1,000, or both. See also *N. J. S.* 2A:170–27.

The evidence here does not establish the charge of atrocious assault and battery "by maiming or wounding," under *N. J. S.* 2A:90–1.

Dr. Sylvia Coenca testified that her examination of the prosecuting witness at the Hackensack Hospital revealed "some very superficial lacerations around the eyes on one side and the cheek, I think—but very superficial—merely scratches more than lacerations"; there was a need only to "clean up the scratches and that's all; there was no more treatment than that." The doctor was then shown a photograph of the prosecuting witness, "to refresh [her] memory"; and she reiterated: "It was just scratches— I remember her very well. It was only scratches." And the doctor was unable to say whether the bruises were inflicted by blows. A police officer told of "weeds and brushes" at the *locus*. The prosecuting witness said that defendant made no mention of sexual relations; there was no "discussion about loving"; and she did not know why the defendant "attacked" her. Another police officer said that he did not notice any scratches on the prosecuting witness when he first saw her. And she admitted that the photographs of her taken not long after the occurrence showed "no scratches" of the face, but she insisted "they were there." Alcoholic excesses may account for other incidents cited by the State, not involving maiming or wounding; and there is the element of exaggeration.

The "down-grading" to "disorderly conduct" of the lesser degree of assault and battery theretofore classified as a misdemeanor, has not altered the essential character and quality of the aggravated offense denounced by *N. J. S.* 2A:90–1. The basic nature of that offense remains the same. In *State v. Maier*, 13 *N. J.* 235, 241 (1953), Chief Justice Vanderbilt said that by the down-grading provision, *N. J. S.*

2A :170–26, the Legislature was providing for "simple assaults and batteries as distinguished from the serious crimes provided for in the three sections of the statutes [adverted to, *N. J. S.* 2A :90–1, "by the vicious act"; *N. J. S.* 2A :90–2, "by the evil purpose of the defendant"; and *N. J. S.* 2A :90–3, "by the use of offensive weapons or threats of violence"]. The Legislature might have interposed between simple assault and simple assault and battery as disorderly conduct and the three kinds of high misdemeanors [referred to], the intermediate offense of assault and assault and battery of general scope as misdemeanors distinguished by definition on the one hand from disorderly conduct and the three kinds of high misdemeanors on the other, and there is much that might be said for such a gradation in an offense of such a wide range as assault and battery, but the Legislature has not yet done so except in [some] limited instances" not pertinent here.

And it goes without saying that the courts cannot do what the Legislature has failed to do.

*N. J. S.* 2A :170–26 renders a person who commits "an assault or an assault and battery" a disorderly person. The definition is not qualified by the adjective "simple"; and it plainly comprehends all assaults and batteries not classable as high misdemeanors according to the definition contained in the cited sections of the statute.

At common law an assault is an attempt to do unlawful bodily harm or injury to another, that is to say, an attempt to commit a battery; and a battery is a consummated or completed assault. Under the common law there is no classification of assaults as to the degree of the offense, all assaults being misdemeanors. Yet some assaults are there regarded as more serious than common assaults, since in addition to the general intent to commit an assault there was a specific intent to do some other act also criminal, as an assault with intent to murder, to rob, or to commit some other felony, often described as "aggravated assaults," and for that reason punishable with more severity than simple assaults. There are no legal or technical differences

at common law between assaults which are slight and assaults that are aggravated; they are not there recognized as distinct and separate crimes, but assaults subject in judicial discretion to heavier penalties according to the degree of aggravation. Now, by statute, aggravated assaults are usually made felonies or high misdemeanors, and they are distinguished from simple assaults by classification according to the felonious intent, *e. g.*, assaults "with intent to kill," "to rape," "to rob," assaults "with deadly weapons," "with intent to do grievous, or great, bodily harm"; and they are sometimes designated as "felonious assaults." *Burdick, Law of Crime,* §§ 338, 345. At common law assaults with intent to commit felonies are misdemeanors, and under this head fall all aggravated assaults; the punishment varies according to the discretion of the court, but not the grade of the offense. *Wharton's Criminal Law* (*12th ed.*), § 840.

There was here no "maiming or wounding" within the intendment of *N. J. S.* 2A:90–1 to sustain the sentence of three to five years in the State Prison, as for the commission of a high misdemeanor therein defined. The act has in view an aggravated assault and battery, involving physical injury, cruel and grievous in its nature and consequences, such as is "atrocious" in its common acceptation. *State v. Capawanna,* 118 *N. J. L.* 429 (*Sup. Ct.* 1937), affirmed 119 *N. J. L.* 337 (*E. & A.* 1938). The statute can mean nothing else; otherwise there would be no line of demarcation between the high misdemeanor and the misdemeanor, reduced to disorderly conduct. There was no charge here of an assault with intent to commit a felony or high misdemeanor.

If the disorderly person provision, *N. J. S.* 2A:170–26, is a constitutional exercise of the legislative power, and it has been so adjudged in *Maier,* then we must abide by the change of policy, however we may regard it; there can be no enlargement of the statutory sense of atrocious assault and battery, as a high misdemeanor, to include other definitive aggravating circumstances where "maiming or wounding" within the understanding of *N. J. S.* 2A:90–1 is wanting,

and the need for criminal sanctions rather than the punitive consequences of disorderly conduct would seem to be preferable as a measure of social and individual justice. Policy is the exclusive province of the Legislature. And the permissible punishment for one adjudged a disorderly person for the given offense, a year's imprisonment and a fine of $1,000, is a sanction of moment.

In *State v. Riley*, 28 *N. J.* 188 (1958), a club was the instrument of the assault and battery committed by the defendants, "an offensive weapon or instrument."

The interpretation of the statute concerns not alone the basic rights of the particular defendant, but the future enforcement of the law as well.

I would reverse the judgment.